F. # 2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

NG CHONG HWA,
       also known as "Roger Ng,"

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. <u>18-CR-538 (S-1) (MKB)</u>

<u>REPLY MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE</u>

1

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................. 1

DISCUSSION ............................................................................... 2

I.   EVIDENCE OF FALSE STATEMENTS REGARDING THE ORIGIN OF
     DIVERTED BOND FUNDS RECEIVED BY THE DEFENDANT'S CLOSE
     FAMILY MEMBER IS RELEVANT AND ADMISSIBLE ........................................ 2

     A.      The Proffered Evidence .............................................. 3

     B.      Argument ........................................................... 6

II.  CERTAIN EVIDENCE THAT POST-DATES THE CHARGED CONSPIRACIES IS
     ADMISSIBLE ........................................................................ 14

     A.      Evidence of Email Accounts Deleted by the Defendant and Co-
             Conspirators is Relevant and Admissible ................................... 15

     ███     ████████████████████████████████████████████ 19

     ███     ████████████████████████████████████████████████ .................... 21

     ███     ███████████████████████████████ ..................................... 24

     E.      The Defendant's Additional Arguments Regarding The Evidence That The
             Government Seeks To Admit are Without Merit ........................................ 27

III. STATEMENTS BY CO-CONSPIRATORS, INCLUDING ████████████████
     ██████████████, ARE ADMISSIBLE ................................................... 31

IV.  THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING
     HIS OWN OUT-OF-COURT STATEMENTS ............................................ 32

V.   THE COURT SHOULD GRANT THE GOVERNMENT'S MOTION REGARDING
     JURISDICTION AND VENUE ................................................................ 34

VI.  THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENTS
     REGARDING THE INTERNAL ACCOUNTING CONTROLS CHARGE THAT
     THIS COURT PREVIOUSLY REJECTED ................................................ 37

VII.   THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING
       EVIDENCE OR ARGUMENT REGARDING THE CIRCUMSTANCES OF HIS
       ARREST IN MALAYSIA, INCARCERATION, EXTRADITION, AND
       PRE-TRIAL CONDITIONS ........................................................................................ 38

VIII.  THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING
       EVIDENCE OR ARGUMENT REGARDING HIS FAMILY BACKGROUND,
       NATIONALITY, AND OTHER SIMILAR PERSONAL FACTORS ..................... 40

IX.    THE DEFENDANT SHOULD PRODUCE ANY EVIDENCE HE INTENDS TO
       ADMIT IN HIS CASE-IN CHIEF ............................................................................ 42

CONCLUSION ..................................................................................................................... 45

## PRELIMINARY STATEMENT

The government previously moved the Court for in limine rulings in connection with the trial in the above-captioned matter.  (ECF No. 90 ("Govt. Mem.")).  The defendant has opposed certain of those motions.  (ECF No. 94 ("Def. Mem.")).[1]  In particular, the defendant opposes the government's motions to (1) admit evidence of documented false statements made to a bank concerning the source of the diverted bond funds received by the defendant's close family member; (2) admit certain statements made after the time period alleged in the superseding indictment; (3) admit certain co-conspirator statements; (4) preclude the defense from offering the defendant's own hearsay statements; (5) preclude evidence or argument concerning this Court's jurisdiction over the trial; (6) preclude improper defense argument concerning the internal accounting controls provisions of the Foreign Corrupt Practices Act (the "FCPA") that were already rejected by this Court; (7) preclude defense evidence concerning the defendant's extradition to the United States for trial; (8) preclude defense evidence or argument concerning the defendant's personal or family circumstances intended to improperly evoke sympathy; and (9) compel the production of defense case-in-chief exhibits under Rule 16 of the Federal Rules of Criminal Procedure.

---

[1]    The defendant has not opposed the government's motions (1) to admit evidence of certain other acts committed by the defendant that constitute direct evidence of the charged offenses and do not constitute propensity evidence under Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"), see Def. Mem. 36 ("[T]he defense believes [the Rule 404(b) evidence] to be intrinsic to the charges and admissible."), and (2) to preclude evidence or argument as to the consequences of the defendant's conviction, see Def. Mem. 44 (agreeing that such evidence is inadmissible at this stage).  As such, the government respectfully submits those motions should be granted.

For the reasons set forth below, the government respectfully submits that the Court should grant the government's remaining motions in limine in their entirety.[2]

## DISCUSSION

## I.    EVIDENCE OF FALSE STATEMENTS REGARDING THE ORIGIN OF DIVERTED BOND FUNDS RECEIVED BY THE DEFENDANT'S CLOSE FAMILY MEMBER IS RELEVANT AND ADMISSIBLE

As set forth in the government's opening brief, the evidence at trial will show that the defendant received a total of approximately $35 million in bond proceeds that had been diverted from 1MDB via a bank account held in the name of a business entity purportedly controlled by ███████████████, his ███████. In May 2012 and September 2013, in anticipation of receiving incoming transfers of millions of dollars on the defendant's behalf, the defendant's ████████ made false statements to a bank representative about the nature and origin of the funds.  The government seeks a ruling in limine that (1) the three bank records in which these false statements were memorialized are admissible as business

---

[2]    The government has filed limited portions of this memorandum and the accompanying exhibits under seal (the "Redacted Information").  While courts recognize a "qualified First Amendment right" to access judicial documents and proceedings and a presumptive right of access to judicial documents under the common law, Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119, 120 (2d Cir. 2006), (quoting Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004)), those rights may be overcome in certain circumstances, including where a court makes "specific, on the record findings" "demonstrating that closure [or sealing] is essential to preserve higher values and is narrowly tailored to serve that interest." United States v. Alcantara, 396 F.3d 189, 199 (2d Cir. 2005); see also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995).  In making that determination, courts apply a balancing test.  United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995).  Here, for the reasons set forth in the government's letter filed on November 3, 2021, public disclosure of the Redacted Information implicates sufficiently "higher values" that warrant sealing.  The government therefore requests that the Court make specific findings, in accordance with Doe, that sealing the Redacted Information is both essential to preserve compelling interests and narrowly tailored to serve those interests.  Alcantara, 396 F.3d at 199 (internal quotation marks omitted).  The government further requests that the Court's findings be made ex parte and under seal.

records under Rule 803(6);[3] and (2) ██████'s statements to the bank representative

memorialized in those records are not hearsay statements because they are not offered for their

truth and because they are statements of a co-conspirator under Rule 801(d)(2)(E).  The

defendant challenges the admissibility of these documents, arguing that (1) the records do not

satisfy the requirements of Rule 803(6) because, in any event, they were not made

contemporaneously with the statements they memorialized; (2) the records are not reliable; and

(3) ██████'s statements are not admissible as co-conspirator statements under

Rule 801(d)(2)(E).  (Def. Mem. 4-18).  The defendant's arguments miss the mark and should be

rejected.

### A.    The Proffered Evidence

In addition to the proffered evidence set forth in the government's opening brief,

the government proffers the following with respect to the bank records at issue, in order to fully

respond to the defendant's arguments:

- **May 25, 2012 Client Profile and Acceptance Checklist (the "2012 Checklist")**:[4]  The 2012 Checklist details a May 22, 2012 conversation between ██████ and a bank client advisor in connection with ██████'s opening of an account in the name of Silken Waters Enterprise Limited, which was later renamed Victoria Square Capital Limited ("Silken Waters / Victoria Square" and the "Silken Waters / Victoria Square Bank Account").  After noting that ██████'s ██ had referred ██████ to the bank, the document recounts that "██████ explained that they have recently taken profit on ██ equity investments in Switzerland totalling [sic] about $26m.  As such, they intend to transfer this funds [sic] back from BSI to Asia, either Singapore or Hong Kong.  As we

---

[3]      The government no longer seeks a ruling in limine on the admissibility of a fourth bank document (a call report dated July 27, 2012), which, rather than recounting the substance of a false statement made by ██████, instead largely restates what the banking transactions themselves show.

[4]      The 2012 Checklist and the 2014 Checklist note, in the upper right-hand corner, a "Print Date/Time."  The statements were obviously memorialized at some point before the "Print Date/Time."  Because the government does not know whether that memorialization occurred days or hours earlier, it has used the "Print Date/Time" as the date on which the records were created.

come highly recommended by ▮▮▮▮▮▮▮, ▮▮ is meeting me today to assess us instead of Credit Suisse Hong Kong." As of May 22, 2012, approximately $577 million of diverted bond funds had been transferred to a bank account at BSI in Switzerland—the very bank mentioned in ▮▮▮▮'s statement—that was controlled by at least two members of the conspiracy. The defendant knew bond funds would be transferred to the BSI account because he attended a meeting in Singapore with BSI representatives in or around April 2012 regarding the anticipated transfer of bond funds into this account. It was likely not until June 5, 2012—two weeks after ▮▮▮▮ spoke to the bank client advisor—that the defendant learned via an email from Leissner that his share of the diverted bond proceeds would be transferred to the Silken Waters / Victoria Square Bank Account from an account at Chiyu Banking Corporation Ltd. in Hong Kong in the name of Capital Place Holdings Limited ("Capital Place" and the "Capital Place Bank Account"), an entity that was beneficially owned and controlled by Leissner and ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- **July 27, 2012 Call Report (the "2012 Call Report")**:[5] The Silken Waters / Victoria Square Bank Account received incoming transfers from the Capital Place Bank Account of $17.5 million on or about June 13, 2012, and $6.9 million on or about July 16, 2012. Because the two transfers exceeded a specified threshold, each of them triggered an internal bank alert. On July 27, 2012, following the first of these alerts, the client advisor for the account created a call report that further memorialized her May 22, 2012 conversation with ▮▮▮▮. In this call report, the client advisor reiterated that ▮▮▮▮ had opened the account based on the "strong recommendation from ▮▮▮▮," and wrote the following, which largely summarized the transfers into the account as of that date: "Client explained that ▮▮ will have incoming funds from ▮▮ sale of investments in other banks e.g., Chiyu Banking Corp., BSI, etc. They will come in 2 tranches due to difference in settlement dates. First tranche is estimated to be USD 17.5 m and the second tranche USD 7 m." A bank employee thereafter conducted an "AML query" by posing three questions to the client advisor, including whether ▮▮▮▮ was the beneficial owner of Capital Place. After the client advisor responded that ▮▮▮▮ was the beneficial owner of Capital Place (in fact, she was not) and addressed the other questions, the transactions were cleared with the following notation: "Transaction is plausible per client's profiling with no suspicious activity noted to date."

- **September 24, 2013 Call Report (the "2013 Call Report")**: On August 22, 2013, a bank representative, copying the client advisor, sent an email to victoriasquare.investment@gmail.com (the "Victoria Square Email") and a personal email account subscribed in ▮▮▮▮'s name (the "▮▮▮▮ Email") stating: "As per your request, attached USD incoming instruction." Thereafter, beginning on or about September 2, 2013, there were numerous internal bank emails regarding an expected incoming "USD11mm" transfer into the Silken Waters / Victoria Square Bank Account.

---

[5]     As noted in footnote 1, the government no longer seeks a ruling in <u>limine</u> regarding the admissibility of this document. The government sets forth the facts relevant to the 2012 Call Report in order to fully respond to the defendant's argument regarding alleged inconsistencies between the 2012 Checklist and the 2012 Call Report.

On September 18, 2013, the bank received incoming transfers of $4.2 million from the Capital Place Bank Account and $6.5 million from a bank account at Morgan Stanley (the "███████ Morgan Stanley Bank Account"). The transfer instructions included incorrect details regarding the Silken Waters / Victoria Square Bank Account, however, and the two transfers were rejected. The client advisor communicated by email with both the ██████ Email and the Victoria Square Email regarding the erroneous transfer instructions on September 18, 2013. That same day, the client advisor was recorded on a bank telephone line discussing the attempted transfers with a representative of a trust company that provided services to Silken Waters / Victoria Square.[6] One of the participants in the call stated that both attempted transfers had been made by the same "partner" (identified as ██████) but that one of the transfers had been erroneously directed to the wrong account (i.e., the Capital Place Bank Account) before being redirected to the Silken Waters / Victoria Square Bank Account. There was discussion in the call regarding whether the money was proceeds of a sale of commercial property, perhaps in London, but neither of the participants could confirm that the funds derived from the sale of real estate. The transfers were later successfully completed on or about September 23 and 24, 2013. On September 24, 2013, the client advisor created the 2013 Call Report, which memorialized a September 18, 2013 call from ██████ to the client advisor at the client advisor's home. The 2013 Call Report recounted the attempted transfers on September 18 and the successful September 23 and 24 transfers. With respect to the source of funds, the 2013 Call Report stated that "[c]lient was in a gold PE venture with ███ friends which has been liquidated," that the funds "came from 2 different banks as ███ has 2 different portions/percentages with 2 friends," and that "[t]he bigger portion was thus from ███ friend who remitted from Morgan Stanley HK and the smaller from another friend who remitted from their account with Chiyu Bank HK."

- **March 24, 2014 Client Profile and Acceptance Checklist (the "2014 Checklist")**: In or around March 2014, ██████ opened a personal bank account at the same bank (the "██████ Personal Bank Account"). The Client Profile and Acceptance Checklist for that personal account, dated March 24, 2014, included a summary of a visit the client advisor made to ██████ at ██████ residence in Malaysia on or about September 11, 2013. The client advisor reported that ███████████████████████ (i.e., ███████████ and the defendant) were also present, and that ██████████ stated that a "gold PE venture that she had with a few friends has been liquidated and she expects appx. USD11m of funds to be returned to ███ by end Sep 2013 which ███ will send to [the bank] to top up ███ account."



---

[6] Apparently as a result of the bank's retention policies, the bank has not produced to the government any recorded calls regarding the Silken Waters / Victoria Square Bank Account from before September 18, 2013.

5

B.      **Argument**

      1.      <u>The Documents Satisfy Rule 803(6)'s Temporal Requirement</u>

Among the other requirements addressed in the government's opening brief,

Rule 803(6) provides an exception to the hearsay rule for business records "made at or near the

time" of the event recorded.  Fed. R. Evid. 803(6).  The rule expressly does not require that a

business record be made simultaneously with the event in order for the record to be admissible.

It is sufficient if a record is made "near the time" of the event in question.  <u>Compare</u> <u>Malek v.</u>

<u>Federal Ins. Co.</u>, 994 F.2d 49, 53 (2d Cir. 1993) (social worker's case notes "were made close to

the time of the events they recorded" and were therefore admissible); <u>Wheeler v. Sims</u>, 951 F.2d

796, 804 (7th Cir. 1992) (deeming challenge to admission of records under Rule 803(6) waived

and concluding, in any event, that a business record memorializing an event that occurred

11 days earlier had been made "at or near the time" of that event); <u>Parker v. Orthofix Inc.</u>, No.

3:17 Civ. 248 (SI), 2019 WL 637701, at *4 (D. Or. Feb. 14, 2019) (medical notes written on the

day of and a week after surgery were admissible under Rule 803(6) because they were "made

reasonably near the time of the events they describe"); <u>Walker v. Spina</u>, No. 17 Civ. 991

(JB/SCY), 2019 WL 418420, at *2 (D.N.M. Feb. 1, 2019) (medical records made within days or

a reasonable period of time satisfy Rule 803(6)'s temporal requirement); <u>with</u> <u>Abascal v.</u>

<u>Fleckenstein</u>, 820 F.3d 561, 565 (2d Cir. 2016) (finding that a report issued six months after the

relevant events was not a contemporaneous recording under Rule 803(6)); <u>United States v.</u>

<u>Strother</u>, 49 F.3d 869, 875 (2d Cir. 1995) (memorandum made six months after the relevant

events not admissible under Rule 803(6)).[7]

---

[7]      The defendant cites only <u>Hertz v. Luzenac Am., Inc.</u>, 370 F.3d 1014 (10th Cir.
2004), an employment retaliation case, in arguing that an interval of a few days between an event
and the creation of a business record fails to satisfy the temporal requirement of Rule 803(6).
<u>Hertz</u>, however, provides scant support for the defendant's argument.  The record at issue in

The 2012 Checklist was completed at most three days after the May 22, 2012 conversation it memorialized, and the 2013 Call Report was prepared no more than six days after the September 18, 2013 conversation it memorialized.  Both records were made sufficiently close to the time of the respective conversations to satisfy Rule 803(6)'s requirement that a business record be "made at or near the time" of the event recorded.  Fed. R. Evid. 803(6); see, e.g., Malek, 994 F.2d at 53; Wheeler, 951 F.2d at 804.

The 2014 Checklist is dated approximately six months after the conversation it memorializes.  Based on the timing alone, this document would not satisfy Rule 803(6)'s temporal requirement.  However, the statement closely tracks the 2013 Call Report, which was made close in time to the statement in question, and is also consistent with emails exchanged in August and September of 2013, when ▮▮▮▮ was expecting an incoming transfer of approximately $11 million and communicated with bank representatives about the funds, including the transfers of this money that were rejected on September 18, 2013.  These corroborating facts give the 2014 Checklist sufficient indicia of reliability to be admitted as a business record under Rule 803(6) or, alternatively, under Rule 807.  Cf. Abascal, 820 F.3d at

---

Hertz was a memorandum memorializing a meeting between an employer and an employee in connection with the employee's termination.  The Tenth Circuit first affirmed the district court's exclusion of the memo on the ground that the memo's proponent had not established that it was the employer's regular practice to prepare such memos and had not reoffered the memo after eliciting additional foundational testimony.  The Tenth Circuit then concluded that the district court would not have abused its discretion in finding the memo untrustworthy given the nature of the memo (noting that the "district court may well have believed that the chief purpose for preparing the memo was to protect against a discrimination claim"), the timing of its preparation (two days after the meeting), and equivocal testimony as to whether it was the employer's regular practice to prepare such memos.  Id. at 1020.  As such, the Tenth Circuit did not hold that a business record prepared only days after an event fails to satisfy Rule 803(6)'s temporal requirement.  Instead, the court considered the circumstances and timing of a particular document's creation in questioning its trustworthiness.  There is no similar constellation of factors here that calls into question the trustworthiness of the 2012 Checklist, the 2013 Call Report or the 2014 Checklist.

565 (suggesting that a report issued outside the time limits for Rule 803(6) may nevertheless be admissible if the information contained therein was gathered "at or near the time of the underlying events that make up the information in the Report"); United States v. Russo, 480 F.2d 1228, 1239-40 (6th Cir. 1973) (computer printout generated 11 months after relevant transaction admissible as business record because based on inputs generated within a reasonable time after each transaction); Fed. R. Evid. 807 (hearsay statement admissible where "supported by sufficient guarantees of trustworthiness").

2.      The Documents Are Reliable

In challenging the reliability of the bank's business records, the defendant first contends that the 2012 Checklist and the 2014 Checklist are incomplete and therefore inadmissible.  (Def. Mem. 9-10.)  This argument should be rejected because the defendant now has complete copies of both documents.[8]

Moreover, and contrary to the defendant's contention, the 2012 Checklist is reliable on its face and consistent with other evidence to be offered at trial.  The document reflects a statement ███████ made to UBS ahead of the Silken Waters / Victoria Square Bank Account's receipt of diverted bond proceeds from Project Magnolia.  ███ statement in May 2012

---

[8] The versions that were previously produced to the defendant were incomplete because the underlying hard copy documents were incorrectly scanned by the government during the creation of the PDF versions produced to the defendant.  This error has been corrected, and the defendant now has the complete documents.   Those completed versions of the 2012 Checklist and the 2014 Checklist are attached hereto as exhibits along with copies of the referenced Call Reports.  This error is without consequence to this motion because even in the incomplete versions that were previously produced, ███████'s statement appeared in its entirety, and the missing pages (pages 2 and 4) did not include particularly pertinent information.  Page 2 includes questions regarding whether the client is a U.S. person, an insider or connected to a listed company, or a "Fiscal Risk affected Client."  The answer to each question is "No."  Page 4 summarizes the client's financial background and source of wealth, and recounts that ███████ had total estimated wealth of $80 million.  Page 4 further references an account at BSI in Switzerland.

flagged the incoming transfers as totaling $26 million, an amount nearly identical to the $24.4 million that was subsequently wired to the account. ███ statement also identified BSI—a Swiss bank—as the bank that would transmit the funds. The defendant had known since at least April 2012 that 1MDB bond proceeds would flow through an account at BSI because he attended a meeting with BSI representatives in Singapore regarding those money flows. Indeed, on or about May 22, 2012, after Project Magnolia had closed, approximately $577 million in diverted bond funds were transferred into an account at BSI in Switzerland that was controlled by co-conspirators. Part of those funds were transferred onward, ultimately moving from Capital Place to the Silken Waters / Victoria Square Bank Account. That Capital Place was not referenced in ███ May 2012 statement to UBS was also unsurprising: It was not until June 5, 2012—shortly before the first tranche of diverted bond funds was transferred to the Silken Waters / Victoria Square Bank Account—that the defendant received via email Capital Place's account information.

In sum, the 2012 Checklist is reliable. It is consistent with other evidence in the case, and, contrary to the defendant's speculative assertions, the client advisor had no reason in opening the Silken Waters / Victoria Square Bank Account to fabricate facts that would be obviously inconsistent with the transactions themselves.[9]

---

[9] The 2012 Call Report—which, as noted, the government no longer seeks to admit—was made after the transactions had occurred and with full information about the exact amounts and how those funds arrived at UBS. At the time she prepared that report, and as reflected in the report itself, the client advisor knew that the funds had not in fact originated in Switzerland and had instead been transferred from Hong Kong. Rather than repeat that inaccurate portion of ██ 's May 22, 2012 statement, the client advisor reiterated that ██████ 's ██ had referred to the bank and then recounted the facts underlying the actual transfers. Nothing about the client advisor's decision to describe the transactions themselves in the 2012 Call Report, rather than ██████ 's incorrect statement about the origin of the funds, undermines the reliability of the 2012 Checklist.

██████'s 2013 statements to UBS regarding transfers into the Silken Waters / Victoria Square Bank Account in September 2013—memorialized in the 2013 Call Report and the 2014 Checklist—are also a reliable recitation of what ██████ told the client advisor. ████ and the defendant (using the Victoria Square Email Account) were in touch with the bank about the anticipated transfers at least as of August 22, 2013 and, as reflected in other UBS internal correspondence, on multiple occasions thereafter.

██████ told the client advisor on both September 11 and 18 that the funds were proceeds of a gold private equity venture in which she had invested with friends, but gave what appear to be two different explanations as to whether the funds had been transmitted to the Silken Waters / Victoria Square Bank Account by one or two friends.  As reflected in a recorded call between the client advisor and a third-party trust company on September 18, 2013, ████████ initially acknowledged to UBS that day that both transfers came from the same source (██████), but falsely claimed that one of the two transfers had been erroneously directed to the wrong account (i.e., the Capital Place Bank Account) before being redirected to the Silken Waters / Victoria Square Bank Account.

But ██████'s explanation—that a single payment to a single recipient on the same day had been divided into two portions, one of which was erroneously sent to Capital

---

Moreover, there is no evidentiary support for the defendant's unfounded assertion that the client advisor and the 2012 Checklist were the subject of an internal bank investigation. (Def. Mem. 12-13.)  Instead, the documents reveal that the 2012 transactions triggered internal bank alerts because they each exceeded a set threshold amount (i.e., an inflow of more than 1.5 million Swiss francs in a month).  The review that followed included an email inquiry regarding whether ██████ was the beneficial owner of Capital Place.  After the client advisor responded that ██████ was the beneficial owner of Capital Place (which, in fact, was beneficially owned and controlled by Tim Leissner and ██████████), the bank cleared the alerts, citing the client's profile (including as a business owner with a net worth of approximately $80 million) and the lack of suspicious activity to date.

Place—made little sense on its face.  As memorialized in the 2013 Call Report, ███████

ultimately gave the client advisor a different explanation:  that the funds had been transferred

from two friends with whom she had invested in the gold private equity venture.  Although this

cover story was potentially facially plausible, it was inconsistent with other evidence in the case.

As set forth in the government's opening brief, the transfers did not originate with two different

friends and did not derive from any investment in a gold private equity venture, as ████████ told

the bank.  Instead, both were made by ██████████, at Tim Leissner's direction.

 The defendant suggests that the 2013 Call Report is not reliable because, while it

recounts a conversation with █████ that occurred on September 18, 2013 it also describes the

transfers that ultimately occurred several days later.  (Def. Mem. 14.)  The defendant is wrong.

Nothing about the fact that the call report recounts the history of the transfers—that there was a

failed attempt on September 18 and successful transfers on or about September 23 and 24—

renders the record unreliable.  In creating the call report on September 24, 2013, the client

advisor clearly both recounted what ██████ had told her about the amount, timing, and origin

of two anticipated incoming transfers and also included information about the actual transfers

themselves.

 3. ██████'s Statements are Admissible Both as Non-Hearsay and
   Co-Conspirator Statements

 The defendant does not appear to challenge the government's argument that █████

███'s statements are admissible non-hearsay because they are not offered for the truth, but rather

to prove that they were false.  (Def. Mem. 15-16.)  Instead, the defendant contends that the bank

records that include those statements are themselves hearsay.  For the reasons just discussed, and

those set forth in the government's opening brief, the bank records are admissible as business

records under Rule 803(6), and ███████'s statements contained in them are admissible to show

that they were made and as a predicate for other proof that they were false.  Anderson v. United States, 417 U.S. 211, 219-20 (1974); United States v. Pedroza, 750 F.2d 187, 203 (2d Cir. 1984) (statement "offered for its patent falsity" is not hearsay); see also United States v. Sedaghaty, 728 F.3d 885, 916 (9th Cir. 2013) ("The hearsay rule does not apply to evidence offered to establish a foundation for later showing, through other admissible evidence, that it was false." (citation and internal quotation marks omitted)).

▇▇▇▇▇'s statements are also admissible as co-conspirator statements under Rule 801(d)(2)(E), although the Court need not reach this issue.  In or about April and May of 2012, ▇▇▇▇ incorporated Silken Waters in the British Virgin Islands, opened the Silken Waters / Victoria Square Bank Account, created a new email account that ▇▇ used to communicate with the client advisor for the account, and made misrepresentations about the origin of nearly $25 million in incoming U.S. dollar transfers.  ▇▇ subsequently made misrepresentations about the origin of another $10.7 million in incoming transfers.  This conduct provides ample basis to conclude, by a preponderance of the evidence, that ▇▇▇▇ knew that the funds "represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law," 18 U.S.C. § 1956(c)(1), that ▇ acted with intent, at a minimum, to conceal the source, ownership, and control of those funds, id. § 1956(a)(2)(B)(i), and that ▇ was a co-conspirator.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987) (findings under Rule 801(d)(2)(E) are to be made by a "preponderance of the evidence"); United States v. Padilla, 203 F.3d 156, 162 (2d Cir. 2000) (when "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him"); see also United

12

States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993) ("statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of" the requirements of the rule).

* * * * *

For the foregoing reasons, evidence of false statements made regarding the origin of diverted 1MDB bond proceeds that were transferred into the Silken Waters / Victoria Square Bank Account, contained in business records maintained by the bank, is admissible.

## II.    CERTAIN EVIDENCE THAT POST-DATES THE CHARGED CONSPIRACIES IS ADMISSIBLE

The defendant's response to the government's motion to admit three categories of relevant evidence that post-date the charged conspiracy periods—(1) the deletion of email accounts used in connection with and in furtherance of the conspiracies by the defendant, his co-conspirators, and others; (2) statements by the defendant and ███ about (a) the need to create and document a cover story for their receipt of criminal proceeds from Leissner, and (b) the defendant's conversations with law enforcement in Singapore about the charged criminal conduct; and (3) ████████████████████████████—largely consists of a detailed discussion of the facts of selected cases cited by the government for general principles of law.  The defendant's response fails virtually entirely to engage with those principles of law, including the most basic one, that "[r]elevant evidence is admissible" unless the Constitution, a statute, or a rule says otherwise.  Fed. R. Evid. 402.  Indeed, nearly all of the defendant's arguments go to the weight of the proffered evidence, not its admissibility.  The defendant has a right to disagree with the government's view of the facts or to argue for different inferences therefrom.  He does not have a right to prevent the jury from hearing evidence because he disagrees with those inferences or denies that the evidence demonstrates his guilt.  See generally United States v. Suarez, 588 F.2d 352, 354 (2d Cir. 1978) (lawyers are entitled to "broad latitude in the inferences they may suggest to the jury"); cf. United States v. Gasperini, No. 16 Cr. 441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017) (rejecting defendant's request to exclude terms "victim" and "victimized" because "Defendant's argument in favor of excluding the terms . . . is, in essence, based on the merits of his case: he argues that the allegations against him do not show that he violated the relevant statutes," but "[t]he

Government is within its rights to take and advocate for a different view of the evidence"), aff'd,
729 F. App'x 112 (2d Cir. 2018).

The defendant's response also repeatedly contends that certain statements of
others should be precluded because they cannot be admitted as co-conspirator statements under
Rule 801(d)(2)(E), but the government never argued, and does not now argue, that such
statements should be admitted under that exception.  By knocking down his own straw man, the
defendant sidestepped the bases actually identified by the government to admit this evidence.

Finally, the defendant contends that certain evidence should be analyzed under
Rule 404(b) rather than as direct evidence, but fails to explain cogently why, even if he were
correct (and he is not), the evidence it is not admissible under Rule 404(b).  As the government
explained in its opening brief, and explains below, the evidence is admissible on both bases.

### A.   Evidence of Email Accounts Deleted by the Defendant and Co-Conspirators is Relevant and Admissible

As set forth at length in the government's opening brief, the defendant, his co-
conspirators, and others used a number of email accounts to communicate with each other about,
among other things, the three charged schemes, and many of these email accounts were
subsequently deleted—in their entirety—in 2015 (collectively, the "Deleted Accounts").  (See
Govt. Mem. 19-24, 30-32, and Govt. Mem. Ex. A).  Significantly, the defendant does not dispute
that the email accounts victoriasquare.investment@gmail.com, queensgate.capital@gmail.com,
roger.ng1@gmail.com, and rogerch.ng@gmail.com are (or at least at relevant times were)
associated with him.  The defendant also does not dispute, nor could he reasonably, that these
four Deleted Accounts, or the other 12 Deleted Accounts, were used by the defendant, co-
conspirators, and others to communicate about and in furtherance of the charged schemes.  Nor
does the defendant dispute that the Deleted Accounts were all deleted in 2015 within a period of

several months, and that many of those accounts were deleted after the defendant finished

receiving transfers of criminal proceeds into an account associated with him, and after the

number of press reports about possible criminal conduct involving 1MDB increased

significantly, raising the specter that the criminal scheme would be uncovered and prosecuted.

      Instead, notwithstanding the obvious inference that the Deleted Accounts were

deleted when they were deleted so as to seek to conceal evidence of the charged schemes and

avoid prosecution, the defendant contends the destruction of the Deleted Accounts is not at all

relevant because "there was no investigation to obstruct when the email accounts were deleted"

and the government "cannot show that [the defendant] ever read or even was aware" of articles

about criminal conduct at 1MDB.  (Def. Mem. 30).  The defendant further contends that even if

the deletion of the Deleted Accounts were relevant, it is purportedly unfairly prejudicial because

the evidence has "no discernable connection to the defendant actually on trial," including

because the government, he asserts, cannot definitively say who controlled certain of the Deleted

Accounts, and thus that the evidence should be precluded under Rule 403.  (Id. at 31).  These

arguments are baseless.

      First, there is no requirement in logic or law that the deletion of an email account

(or the destruction or concealment of any other evidence) is relevant only if the person deleting

the account is aware, at the time, of a then-existing criminal investigation, rather than fearing—

as the evidence here shows the defendant and his co-conspirators did—that one may start.  The

defendant offers no case law or other authority for his apparent view to the contrary, and the

government is not aware of any.  The law accords with common sense: "Consciousness of guilt

evidence is generally admissible in a criminal case." United States v. Vega Molina, 407 F.3d 511, 530 (1st Cir. 2005).[10]

It is equally settled law that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). This is not a difficult standard to meet. See, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." (citing United States v. Ravich, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970))). Plainly, the deletion of the Deleted Accounts "clear[s] the low bar for relevance." United States v. Rutigliano, 614 F. App'x 542, 545 (2d Cir. 2015); see also United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008) (relevance is a "very low standard"). Indeed, the inference that the Deleted Accounts were all deleted because the defendant and his co-conspirators feared being caught for what they had done is not just reasonable, but exceedingly strong. To be sure, the defendant is entitled to disagree, and to ask the jury to believe that he, a global financier, did not read global financial news and just happened to delete his emails around the time the other co-conspirators did the

---

[10] The cases cited by the government in its opening brief, which the defendant unsuccessfully attempts to dismiss (Def. Mem. 28-30), are not to the contrary. While in those particular cases evidence was destroyed after a defendant learned of an investigation or after charges were brought, none of those cases hold that knowledge of a definite, preexisting investigation is required for evidence of the deletion, concealment, or destruction of evidence to be relevant—a proposition at odds with Rule 402 and common sense. Moreover, the defendant's contention that United States v. Costello, 352 F.2d 848, 850 (2d Cir. 1965) is inapplicable because the government is seeking to admit the Deleted Accounts "not to show the existence of the conspiracy" but the defendant's "supposed consciousness of guilt" is simply incorrect— evidence of the Deleted Accounts is clearly relevant to show the defendant's participation in the charged conspiracies and the coordination between and/or common purpose of the defendant and other members of those conspiracies in destroying evidence of their criminal activity.

same.  But that is not a basis to preclude the jury from considering the evidence and reaching a

different conclusion.  See, e.g., United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)

(rejecting argument that statement the government offered to show consciousness of guilt should

be precluded because the defendant denied making the statement; explaining such arguments are

"for the jury to weigh and do not affect admissibility"); United States v. Schultz, 333 F.3d 393,

416 (observing that "factors which make evidence less than conclusive affect only weight, not

admissibility" (internal quotation marks omitted)); United States v. Sovie, 122 F.3d 122, 127 (2d

Cir. 1997) (argument that evidence has been tampered with or is incomplete goes to the "weight

of the evidence rather than to its admissibility"); see generally Suarez, 588 F.2d at 354.

   Second, the defendant is simply incorrect when he asserts that the government

"cannot connect [the defendant himself] to many of the email accounts in question" (Def. Mem.

30), although the evidence would remain relevant even if the government could not so connect

any of the Deleted Accounts.  As noted above, the defendant does not dispute that all of the

Deleted Accounts were used by the defendant, his co-conspirators, and others about and in

furtherance of the charged schemes.  Four of the Deleted Accounts are directly associated with

the defendant, and the government expects to introduce evidence that four of the other Deleted

Accounts (dealrainman1@gmail.com, jho.low@gmail.com, ███████████████, and

█████████████) were used to communicate directly with the defendant during the

charged conspiracy periods about, among other things, the 1MDB deals.  The remaining Deleted

Accounts were used to communicate with Low, Leissner, ███ and others during the same time

periods about the same subjects.  The defendant's assertion that these accounts are irrelevant

accordingly has no basis in fact.  That the same group of individuals was using the Deleted

Accounts to communicate about and in furtherance of the charged conspiracies in the same time

period, and then they, <u>along with multiple accounts associated with the defendant</u>, were all

deleted in their entirety, easily meets the "very low standard" for relevance.  <u>Al-Moayad</u>, 545

F.3d at 139.[11]















███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

### E.   The Defendant's Additional Arguments Regarding The Evidence That The Government Seeks To Admit are Without Merit

In addition to the specific arguments about each subcategory of evidence addressed above, the defendant also makes two overarching arguments: first, that evidence that post-dates the conspiracy periods can only be analyzed pursuant to Rule 404(b) because it cannot "directly establish" an element of the charged conspiracies, since it post-dates them, and second, that the government allegedly failed to analyze the evidence in its motion under Rule 404(b), and even if it did, such evidence would not be admissible under that rule.  (Def. Mem. 18-26).  Both arguments are meritless.

First, it has long been the law that post-conspiracy evidence is analyzed no differently from any other evidence.  If it is relevant, it is admissible, unless the Constitution, a statute, or the Rules of Evidence provide to the contrary.  Fed. R. Evid. 402.  Contrary to the central premise of the defendant, there is no neat during- and post-conspiracy evidentiary dividing line, where direct evidence must arise in the former, and the only admissible evidence from the latter is Rule 404(b) evidence.  See, e.g., United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010) (holding that evidence of the defendant's statements on recorded calls that were made more than four years after the charged conspiracy period were relevant and admissible to show the defendant's consciousness of guilt, knowledge and participation in the charged conspiracy); United States v. Koppers Co., Inc., 652 F.2d 290, 298 (2d Cir. 1981)

("post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy").
Moreover, this basic principle applies with equal force with respect to the post-conspiracy acts of
co-conspirators.  See, e.g., Anderson v. United States, 417 U.S. 211, 221-22 (1974) ("[A]cts of
one alleged conspirator could be admitted into evidence against the other conspirators, if relevant
to prove the existence of the conspiracy, even though they might have occurred after the
conspiracy ended." (internal quotation marks omitted)).

      Second, the defendant's assertion that the government "does not analyze the Post-
Conspiracy Material under Rule 404(b)" (Def. Mem. 21) is incorrect.  While the government has
argued that all of the evidence discussed above is direct evidence because it arises from and is
inextricably intwined with the charged conspiracies, in its opening brief, the government did
analyze, in the alternative, the evidence of the Deleted Accounts (Section II.A), the evidence of

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ (Section II.C.) under Rule 404(b).  (See
Govt. Mem. 32 n.3, 35 n.5).  The Court need not reach this issue, but for the reasons set forth in
the government's opening brief, all of this evidence is admissible under Rule 404(b) regardless
of whether it is admissible as direct evidence (as it is).

      With respect to the evidence of the Deleted Accounts in particular, the defendant
conclusorily asserts that, "if analyzed under Rule 404(b)," this evidence should be precluded
because it "could [not] possibly have any impact on the alleged conspirators' mindset in
'enter[ing] into' the conspiracy, as the deletions happened months after the end of the" charged
conduct.  (Def. Mem. 27).  This assertion, on which the defendant does not elaborate, is
puzzling.  Putting aside that evidence of concealment or deletion, and thus evidence of the

consciousness of guilt, is probative of whether a defendant engaged in wrongdoing, here, by entering into a conspiracy—and thus that the evidence indeed sheds light on conspirators' mindset—the defendant's argument is irreconcilable with the plain text of Rule 404(b).  Rule 404(b) allows evidence of a "crime, wrong or other act" to be admitted for any number of purposes, including as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004); see also United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017).  Multiple of those purposes are present here.  Evidence of the use of the Deleted Accounts in connection with and in furtherance of the charged conspiracies (e.g., to discuss the 1MDB bond deals, transactions designed to launder criminal proceeds, etc., all via non-Goldman email accounts) and the subsequent, coordinated deletion of those accounts demonstrates the defendant's knowing participation in the conspiracies, the nature of the corrupt and close relationship between the defendant, Low, Leissner, and others involved in the conspiracies, and a lack of accident or absence of mistake with respect to the defendant's involvement in the conspiracies.

With respect to the evidence in Sections II.B, II.C. or II.D., the defendant makes no argument why such evidence would not be admissible pursuant to Rule 404(b) other than to make the conclusory statement referenced.  As with the evidence of the Deleted Accounts, the evidence discussed in Sections II.B., II.C. and II.D. is all properly admissible both as direct evidence and under Rule 404(b) to show, among other things, the defendant's knowledge and

intent, the close and corrupt relationship between the defendant and his co-conspirators, and the absence of mistake or lack of accident.

III.   **STATEMENTS BY CO-CONSPIRATORS, INCLUDING** ███████████ ███████████**, ARE ADMISSIBLE**

The defendant submitted only a conclusory response to the government's motion

to admit certain statements by ██████████████████ as co-conspirator statements

pursuant to Rule 801(d)(2)(E), reiterating his legally baseless request for a hearing under

Rule 104 to determine the admissibility of such statements.  (Def. Mem. 36).  For the reasons

given in the government's opening brief, the facts proffered by the government are easily

sufficient to establish by a preponderance of the evidence that both ████████████

████ participated, at a minimum, in the charged money laundering conspiracy and that

statements they made between 2012 and 2014 regarding banking transactions involving diverted

bond funds are therefore admissible.  (Govt. Mem. 66-72).  Moreover, as set forth in the

government's brief in opposition to the defendant's motions in limine, the defendant's request

for a pre-trial hearing concerning the admissibility of potential co-conspirator statements should

be denied because it is contrary to the well-settled protocol in the Second Circuit, is

inappropriate based on the facts of this case, and is burdensome and unnecessary.  (ECF No. 93

at 1-8).

IV.    **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM INTRODUCING HIS OWN OUT-OF-COURT STATEMENTS**

The defendant's opposition mischaracterizes the government's motion to preclude the introduction of his own out-of-court statements for their truth as a motion to preclude him from "introducing anything he said to anyone about any topic . . . under all circumstances." (Def. Mem. 36).  At its core, however, the defendant's response makes clear that he actually agrees with the government's position—the defendant may not introduce his own statements until he demonstrates they are relevant and either non-hearsay or subject to a hearsay exception. (Def. Mem. 37).  As a result, the Court should preclude the defendant from introducing such statements at trial until and unless the defendant is able to make such a showing.

Prior to the filing of its opening brief, the government had no understanding of which if any of the defendant's out-of-court statements he may seek to introduce at trial because, among other things, the defendant has not produced any Rule 16 discovery; has not identified any documents that he will seek to affirmatively introduce during the government's case; and has not moved to admit any of his own statements in limine.  (See Govt. Mem. 73; see also infra Section X).  In his opposition, for the first time, the defendant stated that he will offer at trial his own out-of-court statements contained in "emails and text messages" he sent to others, or contained in certain Goldman "logs" and other documents.  (Def. Mem. 37-41).  However, because the defendant has failed to identify these statements or the alleged bases for their admission with any specificity, the government cannot adequately respond at this time.

That said, the arguments that the defendant has made in the abstract appear internally inconsistent and suggest that the government may object to the admission of such statements on multiple grounds.  For example, the defendant argues on the one hand that his statements in Goldman "logs" allegedly reporting meetings with co-conspirator Low are

admissible because he would <u>not</u> offer them for the truth of the fact that he met with Low at certain times or in certain locations, but, at the same time, characterizes these statements as evidence of his faithful, accurate fulfillment of his obligation to report such meetings.  (Def. Mem. 39).  That is, the defendant simultaneously contends that he would not be offering such documents for the truth of the existence of the meetings, but also that he would argue from those records that he accurately reported the existence of those meetings to Goldman (ostensibly, as part of an argument that he did not circumvent Goldman's internal controls).  These sorts of arguments will need to be evaluated carefully on a statement-by-statement basis, and the government reserves all objections until that time.

## V.    THE COURT SHOULD GRANT THE GOVERNMENT'S MOTION REGARDING JURISDICTION AND VENUE

The defendant concedes that he "will not be comparing the lack of venue to other Districts in which the case could actually have been brought consistent with the law, or that this Court does not have jurisdiction over this case."  (Def. Mem. 42).  While this concession addresses certain of the issues raised in the government's motion in limine, it does not squarely recognize that it would be improper for the defendant to argue to the jury that this case should have been prosecuted elsewhere.  For the reasons stated in the government's motion in limine, the Court should explicitly preclude the defendant from offering any evidence or argument regarding whether the case should have been brought in this District.  (See Govt. Mem. 76-79).

In addition, the defendant's response to the government's motion reveals his intent to confuse the jury about what the government must prove as to venue.  He argues that it is undisputed that to establish venue, the government "must prove three things[:]  First, that an act in furtherance of the crime at issue took place in this District.  Second, that from the perspective of the defendant, venue in this District was foreseeable.  Third, that there are substantial contacts in this District."  (Def. Mem. 41).  This unsupported statement misrepresents the government's position and the law.  As the government explained in its motion, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue."  United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (emphasis added); accord United States v. Khalupsky, 5 F.4th 279, 291 & n.35 (2d Cir. 2021).

The government has asked the Court to ensure the defendant makes arguments in line with this binding law, but in opposing that motion, the defendant misstates the law on two fundamental points.  First, the defendant claims that the "act in furtherance" and "foreseeability"

34

are two distinct, conjunctive elements that the government must prove, but they are actually disjunctive—to demonstrate venue, the government need only prove one, not both.

Second, the defendant seeks to re-litigate a question that was already resolved by this Court by creating a new legal element for the jury's consideration: the defendant's "substantial contacts" in this District. But the defendant fails to acknowledge that the substantial contacts test is not a question for the factfinder, but a purely legal question and one this Court considered on the defendant's motion to dismiss. (Sept. 3, 2021 Mem. and Order at 53-54, ECF No. 83). As the Second Circuit has explained, assessment of a defendant's "substantial contacts" with a district is part of a court's venue analysis and designed "to ensure that the policies and considerations underlying the Constitution's commands respecting venue have been preserved." United States v. Saavedra, 223 F.3d 85, 89 (2d Cir. 2000). See id. at 93 ("[A] court should ask whether the criminal acts in question bear 'substantial contacts' with any given venue." (emphasis added)); United States v. Lange, 834 F.3d 58, 71 (2d Cir. 2016) ("[O]n occasion we have supplemented our venue inquiry with a 'substantial contacts' test . . . ." (quoting United States v. Rutigliano, 790 F.3d 389, 399 (2d Cir. 2015)) (emphasis added)); see also United States v. Coplan, 703 F.3d 46, 80 (2d Cir. 2012) (noting that the Second Circuit has "alternately applied and ignored the substantial contacts test" and affirming the district court's application of the legal test). Furthermore, as the Second Circuit has made clear, "when an overt act in furtherance of a criminal conspiracy has been committed in the district . . . , this supplemental [substantial contacts] inquiry has no relevance" because "commission of an overt act in the district of prosecution fulfills [the] 'substantial contacts' test as to all members of the conspiracy." United States v. Kirk Tang Yuk, 885 F.3d 57, 70-72 (2d Cir. 2018).

Thus, while the defendant may decide to argue that the government has not proven by a preponderance of the evidence that a venue conferring act ever occurred in this district, any such argument must comply with the binding law of this Circuit, and not a legal test invented in the defendant's brief.[16]

---

[16] The government's requests to charge will include a venue instruction that reflects the applicable legal framework.

## VI.   THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENTS REGARDING THE INTERNAL ACCOUNTING CONTROLS CHARGE THAT THIS COURT PREVIOUSLY REJECTED

In its opening brief, the government moved to preclude the defendant from presenting evidence and making arguments in support of legal arguments that this Court rejected in denying the defendant's motion to dismiss the Indictment.  (Govt. Mem. 80-82).  In opposing the government's motion, the defendant did not engage the government's arguments on the merits and instead asserted broadly that he should be permitted to argue these same points to the jury because "a criminal defendant does not forfeit his right to a jury trial by making pretrial motions."  (Def. Mem. 42).  Of course, the government does not seek to preclude the defendant from contesting facts that are legally relevant to the internal accounting controls charge in Count Two.  Rather, the government merely seeks to preclude arguments, and evidence in support thereof, that—as the Court previously ruled—have no legal bearing on the charge in Count Two. Accordingly, for the reasons stated in the government's opening brief, the defendant should be precluded from adducing evidence and arguing that (1) he could not have violated the FCPA's internal accounting controls provision because the bribes at issues were paid from assets that belonged to 1MDB; (2) prior enforcement actions involving the FCPA's internal accounting controls provision "do not square" with the allegations in Count Two because they involved bribes paid with the company's own funds; (3) the circumvention of internal accounting controls requires the falsification of an accounting document; and (4) he lacked sufficient notice that his conduct could violate the internal accounting controls provision or that the charge in Count Two is otherwise unfair.

VII.   **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING THE CIRCUMSTANCES OF HIS ARREST IN MALAYSIA, INCARCERATION, EXTRADITION, AND PRE-TRIAL CONDITIONS**

The Court should preclude evidence and argument concerning the defendant's arrest, incarceration, extradition, and pre-trial conditions as irrelevant.[17]  As noted in the government's motion, the only possible purpose of such evidence or argument—which might include, for example, the fact that the defendant has not seen his family since his extradition, or the fact that he is currently unable to travel outside of New York—is to improperly invoke sympathy from the jury.  (Govt. Mem. 83-84).  The defendant, without suggesting any permissible purpose for offering such evidence or engaging with any of the caselaw cited by the government, simply asks that the court decide this motion "in the context of trial."  (Def. Mem. 43).  Having offered no basis to admit this type of evidence or argument, and having offered no basis to delay a ruling on this matter until after the trial begins, the Court should preclude such evidence or argument <u>now</u> to avoid the defendant from improperly referring to these issues in front of the jury—and in particular, during his opening statement—and unfairly prejudicing the government, as the jury may not easily set aside that information even if the government timely objects and the comment is struck.

Precluding this evidence is particularly important where the specific circumstances behind the defendant's orchestrated ploy for sympathy, as outlined in his prior filings in this case (<u>see</u> ECF No. 46), are subject to various interpretations.  The defendant has said he waived extradition and voluntarily came here to "bravely engage our justice system." (ECF No. 46 at 1, 5).  This argument ignores that the defendant may have had other motivations

---

[17]   <u>See</u> <u>supra</u> Section II.C.

for waiving extradition, such as reducing his overall time in prison.  For example, had he availed himself of his purported legal and factual challenges to the extradition process (ECF No. 58 at 7), the government understands the defendant would likely have been incarcerated in a Malaysian prison prior to trial on charges in Malaysia that would have preceded any extradition, a sequence of events that could have taken years.  ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████.

That said, the defendant's motivations for his post-arrest actions and the circumstances surrounding his extradition are entirely irrelevant to the questions before the jury at trial—whether the defendant conspired to violate the FCPA and to commit money laundering—and exactly why the Court should decide this motion now, as these ancillary issues serve only to confuse the jury and improperly elicit sympathy.  Should these circumstances somehow become relevant during the evidentiary portion of the trial—though it is difficult to imagine how they would—the Court could then consider the defendant's request to introduce such evidence.  See United States v. Rankin, 2021 WL 5049354, at *2 (D. Conn. Oct. 31, 2021) (on pre-trial motion, precluding defendant's introduction of irrelevant evidence during opening statements for failure to show a purpose other than confusion and jury nullification, but acknowledging court's flexibility to address evidentiary issues as they arise through limiting and clarifying instructions).

Accordingly, the court should preclude any statements, argument or evidence surrounding these circumstances.

VIII.   **THE COURT SHOULD PRECLUDE THE DEFENDANT FROM OFFERING EVIDENCE OR ARGUMENT REGARDING HIS FAMILY BACKGROUND, NATIONALITY, AND OTHER SIMILAR PERSONAL FACTORS**

The Court should preclude the defendant from offering certain argument and evidence regarding his nationality, family background, and other similar personal factors. Despite previously arguing that his Malaysian nationality was one of his only two roles in this case, the defendant now acknowledges the charges against him were not brought because he is Malaysian and agrees not to make such an argument at trial.  (Def. Mem. 43).  While this narrows the disagreement, the Court should further preclude any irrelevant argument or evidence of these circumstances.

The defendant offers certain ways in which he believes his nationality could be relevant:  in his dealings with the Malaysian Central Bank while working with Goldman, in his travels, and in his relationship with his charged co-conspirator Low.  It is unclear why the defendant's nationality—as opposed to other factors, including his professional experiences and senior roles at Goldman—bears on his dealings with the Malaysian Central Bank and his travels. The government agrees, however, that the defendant's nationality, among other things, played a part in how he was able to quickly build trust with his Malaysian co-conspirator Low.  As a result, the Court should balance the probative value of any proffered evidence related to the defendant's nationality against the risk of undue sympathy or bias.  See United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).

The defendant also suggests that ███████████████████████████████ ████████████████████████ will be relevant to evidence introduced by the government at trial. (Def. Mem. 43).  This is correct only in as far as these facts go to the charged conspiracies.  (See, e.g., Govt. Mem. 11-18, 24-28, 32-39).  Unlike the evidence the government is asking the Court to admit, however, other tangential evidence of the defendant's relationships,

where invoked to elicit sympathy or for other improper purposes, should be excluded.  While it is challenging to predict all of the irrelevant ways in which the defendant may raise his family status or nationality, any argument regarding his separation from his wife and child during the pendency of this proceeding or argument suggesting this prosecution is inappropriate due to his nationality (see supra Section VII) is improper.  The Court should preclude any argument that draws attention to the defendant's nationality, family circumstances, and other similar circumstances in order to invoke the jury's sympathy.

## IX.     THE DEFENDANT SHOULD PRODUCE ANY EVIDENCE HE INTENDS TO ADMIT IN HIS CASE-IN CHIEF

Rule 16 requires the defendant to produce all non-impeachment exhibits he intends to use in his defense at trial, whether the exhibits will be introduced through a government witness or a witness called by him.  United States v. Napout, No. 15-cr-252 (PKC), 2017 WL 6375729, *7 (E.D.N.Y. Dec. 12, 2017).  As explained in the government's opening brief, Rule 16 does not require, and the government is not asking this court to order, the defendant's disclosure of all evidence he intends to use for purposes of cross-examining a government witness.  (Govt. Mem. 89).  But "where a defendant cross-examines a government witness to 'buttress[ ] her theory of the case,' rather than to impeach the testimony given by the witness on direct examination, '[t]he cross-examination . . . is properly seen as part of the defendant's case-in-chief.'"  Napout, 2017 WL 6375729, at *7 (quoting United States v. Hsai, No. 98-cr-57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000)).

The defendant incorrectly argues he is required to provide reciprocal discovery under Rule 16(b)(1)(A) only when the government has rested and he seeks to admit documents or records through witnesses he has called.  He strains to find support for his position, instead arguing a narrow interpretation of "case-in-chief" that is unsupported by the law.  The Eleventh Edition of Black's Law Dictionary defines "case-in-chief" as:  "1.  The evidence presented at trial by a party between the time the party calls the first witness and the time the party rests.  2. The part of a trial in which a party presents evidence to support the claim or defense."  Black's Law Dictionary (11th ed. 2019) (emphasis added).  To accept the defendant's argument would require the court to completely ignore the second part of the definition of "case-in-chief."  Moreover, the Napout court addressed this very issue in a motion in limine, considering "whether Rule 16 also requires defendants to identify non-impeachment exhibits they intend to

introduce during their cross-examination of witnesses called by the government during its case in chief."  2017 WL 6375729, at *6.  The court referenced a similar definition of "case-in-chief" in a prior version of Black's Law Dictionary and rejected defendant's interpretation of "case-in-chief" as referring "only to 'the part of the trial in which a party calls its first witness until it rests.'"  Id. at *7.  The court held that the defendants were required to identify all non-impeachment exhibits they intended to use at trial, "whether the exhibits [were] introduced through a government witness or a witness called by a Defendant."  Id.  And the defendant's argument is also illogical:  were there to be a complete overlap in government and defense witnesses, the defendant's interpretation would allow him to shirk entirely his Rule 16 discovery obligations so long as he presented his evidence during the cross-examination of the government's witnesses.  Thus, the defendant's position cannot stand.

The defendant's argument that production of all non-impeachment evidence the defendant intends to use at trial impacts the defendant's constitutional rights can be likewise rejected.  (Def. Mem. 46).  Rule 16's requirement that the defendant produce non-impeachment evidence to be presented during the government's case-in-chief does nothing to improperly shift the burden of proof to the defendant.  The defendant need not offer evidence, call witnesses, or put on a case-in-chief.  The defendant remains free to cross-examine the government's witnesses on matters covered during direct examination and credibility issues.  To the extent the defendant seeks to introduce admissible non-impeachment evidence during the cross-examination of the government's witnesses, he need only produce that evidence to the government in advance of trial or risk its exclusion.  See Napout, 2017 WL 6375729, at *8.

Accordingly, the Court should order the defendant to produce any evidence he intends to use in his defense or as non-impeachment evidence, regardless of which party calls the witness, immediately, but no later than January 3, 2022.

## CONCLUSION

For the reasons set forth above, the government's motions in limine should be

granted.

Dated:      Brooklyn, New York
            December 1, 2021

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney

                    By:       _____/s/_____
                              Alixandra E. Smith
                              Drew G. Rolle
                              Dylan A. Stern
                              Assistant U.S. Attorneys
                              (718) 254-7000

                              DEBORAH L. CONNOR
                              Chief, Money Laundering & Asset Recovery Section
                              Criminal Division
                              U.S. Department of Justice

                    By:       _____/s/_____
                              Jennifer E. Ambuehl
                              Nikhila Raj
                              Trial Attorneys

                              JOSEPH BEEMSTERBOER
                              Acting Chief, Fraud Section
                              Criminal Division
                              U.S. Department of Justice

                    By:       _____/s/_____
                              Brent Wible
                              Trial Attorney